OPINION
{¶ 2} Defendant, Klosterman Baking Co., Inc. ("Klosterman"), appeals from an order denying its motion for a new trial or judgment notwithstanding the verdict.
 {¶ 2} Klosterman bakes and distributes bread, buns, rolls, and other baked goods. Before 1992, Klosterman's products were primarily delivered by truck drivers employed by *Page 2 
Klosterman. Plaintiff, Michael Davidson, was employed as one of these drivers. The drivers were paid a base salary and an 8% commission on sales.
 {¶ 3} In 1992, Klosterman switched from a network of company-employed drivers to a network of independent distributors. The company-employed drivers were given an opportunity to become independent distributors of Klosterman's products by purchasing distribution rights. Approximately 90% of the company-employed drivers, including Davidson, took advantage of this opportunity. In November of 1992, Davidson entered into a Distributor's Agreement with Klosterman. As an independent distributor, Davidson received neither a base salary nor a commission. Rather, Davidson earned his income by purchasing products from Klosterman and reselling those products at a mark-up to customers in his territory.
 {¶ 4} One of the largest customers of Klosterman located within Davidson's assigned territory was Classic Delight. At the time Davidson became an independent distributor of Klosterman's products, Classic Delight was receiving Klosterman's products by a method known as "drop-ship". Under the drop-ship method, a customer would receive delivery of Klosterman's products via a Klosterman-owned trailer truck. An independent distributor like Davidson received no income *Page 3 
from the sale of products delivered by the drop-ship method because the independent distributor did not sell or deliver the products.
 {¶ 5} Klosterman eventually discontinued the drop-ship method of distribution and requested its independent distributors to begin delivering Klosterman's products to the customers that had previously received the products via the drop-ship method. Therefore, Davidson began distributing Klosterman's products to Classic Delight.
 {¶ 6} Davidson distributed Klosterman's products to Classic Delight until January of 2002. At that time, Larry Mescher, Regional Vice President of Sales of Klosterman, informed Davidson that Classic Delight was going to begin picking up Klosterman's products directly from Klosterman's bakery in Springfield. Classic Delight received a discount on the price of Klosterman's products as a result of the direct pick up. Davidson would no longer play any role in the distribution of Klosterman's products to Classic Delight and would not receive any income from the sale of Klosterman's products to Classic Delight.
 {¶ 7} Klosterman terminated the Distributor's Agreement with Davidson on July 22, 2004. The termination letter provided to Davidson, which was signed by Larry Mescher, cited *Page 4 
"repeated violations" of Section 11.3 of the Distributor's Agreement resulting from numerous customer complaints relating to Davidson's service. Pursuant to Section 11.4 of the Distributor's Agreement, Klosterman was then obligated to sell Davidson's "Distribution Rights to a qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement." Klosterman did not sell the distribution rights.
 {¶ 8} On September 29, 2005, Davidson commenced an action against Klosterman seeking compensatory and punitive damages. A jury trial was held on October 2-4, 2006. The jury found that Klosterman did not breach the Distributor's Agreement by not permitting Davidson to service Classic Delight between November 1, 1992 and September 30, 1993. (Dkt. 29.) But the jury found that Klosterman did breach the Distributor's Agreement by: (1) not permitting Davidson to service Classic Delight between January 1, 2002 through July 22, 2004 ("The Classic Delight Claim") (Dkt. 30); (2) the manner in which Klosterman terminated Davidson's distributorship on July 22, 2004 ("The Termination Claim") (Dkt. 31); and (3) failing to sell the distributor rights to Davidson's former territory after his distributorship was terminated ("The Sale-of-Rights Claim") (Dkt. 32). The jury found that these three breaches *Page 5 
proximately caused damages to Davidson and awarded him $324,693.00.
 {¶ 9} The trial court entered the jury's verdict on October 13, 2006. Klosterman filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court overruled Klosterman's motion. Klosterman filed a timely notice of appeal.
ASSIGNMENT OF ERROR
 {¶ 10} "THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL."
 {¶ 11} The particular error Klosterman assigns attacks the trial court's denial of the alternative motion that Klosterman filed pursuant to Civ. R. 50(B) for a judgment notwithstanding the verdict and Civ. R. 59(A) for a new trial. (Dkt. 47). Klosterman did not identify on which subsection of Civ. R. 59(A) it relied, but a review of the motion demonstrates that it was grounded on subsection (A)(6): "The judgment is not supported by the weight of the evidence." Civ. R. 50(B) prohibits a judgment notwithstanding the verdict on the same grounds.
 {¶ 12} In any event, Klosterman's argument on appeal is not a contention that the trial court abused its discretion when *Page 6 
it denied Klosterman's motions, but is instead an attack on the judgment the court entered on the jury's verdict on a claim that the verdict is against the manifest weight of the evidence, and therefore the judgment the court entered on the verdict must be reversed. The standard of review we apply to that contention is: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, 280.
 {¶ 13} We will address separately the three verdicts that make up the $324,693.00 award to Davidson.
 The Classic Delight Claim {¶ 14} The jury found that Klosterman breached the Distributor's Agreement by not permitting Davidson to service Classic Delight between January 1, 2002 through July 22, 2004. (Dkt. 30, 36). The jury found that this breach proximately caused damages to Davidson and returned a verdict for Davidson in the amount of $177,749.00. (Dkt. 30, 37-38).
 {¶ 15} Klosterman argues that the jury's verdict is against the manifest weight of the evidence because the undisputed evidence at trial showed that Classic Delight's switch to service by dock pick-up in 2002 was the result of a decision *Page 7 
made by Classic Delight, which allowed Klosterman, pursuant to Section 9.2 of the Distributor's Agreement, to change its method of distribution to Classic Delight without breaching its Distributor's Agreement with Davidson. We do not agree.
 {¶ 16} Section 9.2 of the Distributor's Agreement provides:
 {¶ 17} "CUSTOMER MANDATED CHANGE: In the event that DISTRIBUTOR is unable to continue service to any Outlet, by reason of the demand of thecustomer for service by any method other than direct store doordelivery, and DISTRIBUTOR is unable or unwilling to effect such alternate service, KLOSTERMAN shall thereafter be permitted to make other arrangements to serve such Outlet, which service shall not be deemed to violate DISTRIBUTOR'S rights hereunder." (Emphasis supplied).
 {¶ 18} Contrary to Klosterman's arguments, the evidence was not undisputed that Classic Delight's decision to seek a change in distribution method was unrelated to Klosterman's conduct. Rather, evidence was presented at trial that Klosterman first approached Classic Delight about changing the distribution method, which offered a lower price to Classic Delight for Klosterman's products.
 {¶ 19} Davidson testified regarding his conversation in January of 2002 with Larry Mescher, Regional Vice President of *Page 8 
Sales at Klosterman. Davidson testified that Mescher told him that Classic Delight was receiving products from one of Klosterman's competitors in Pennsylvania at a cheaper price. Mescher told Davidson that Klosterman had offered Classic Delight the opportunity to pick the product up directly from Klosterman's dock at a substantial discount in price. Tr. 197.
 {¶ 20} Further, Phil Collins, the Marketing Manager for Klosterman, testified that Klosterman offered Classic Delight a discount if Klosterman's products were sold directly to Classic Delight rather than through Davidson. Tr. 102. Indeed, Classic Delight received a 20% discount from Klosterman when Classic Delight began picking up the products directly from Klosterman's dock. Tr. 152.
 {¶ 21} On the other hand, Dennis Wiltshire, Executive Vice President of Klosterman, testified that Classic Delight approached Klosterman about picking up products directly from Klosterman's dock at a discount in price. According to Wiltshire, Classic Delight had purchased a tractor trailer and wanted to use that trailer to pick up Klosterman products at the bakery. Tr. 248-49. But, as Davidson points out, Wiltshire's credibility was tainted by his admission on cross-examination that he testified incorrectly earlier at trial *Page 9 
because he was afraid of testifying in a way that could implicate Klosterman in a violation of the antitrust laws. Tr. 275-76.
 {¶ 22} "A party who prevents performance on his or her own part or on the part of the adverse party cannot take advantage of such a nonperformance. Where the obligations arising under a contract have attached, and subsequent thereto one party without the consent of the other does some act or makes some new arrangement that prevents the carrying out of the contract according to its terms, he or she cannot avail himself or herself of his or her misconduct to avoid liability to the other parties. It is no excuse for one to allege that the other party has failed to comply with a contract where compliance with the contract has been prevented by the party asserting such a defense." 18 Ohio Jurisprudence 3d (2001, Supp. 2007) 119, Contracts, Section 214. See also Suter v. Farmers' Fertilizer Co. (1919), 100 Ohio St. 403, syllabus.
 {¶ 23} "Because the factfinder, be it the jury or . . . the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is *Page 10 
within the peculiar competence of the factfinder, who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Seasons Coal Co., Inc. v.City of Cleveland (1984), 10 Ohio St.3d 77, 81.
 {¶ 24} Based on Davidson's testimony, a reasonable juror could find that Klosterman approached Classic Delight and offered it a discount if Classic Delight would agree to pick up Klosterman's products at Klosterman's dock rather than continue to receive the product from Davidson. Also, a reasonable juror could find that this action by Klosterman did not qualify as a "customer mandated change" under Section 9.2 of the Distributor's Agreement, because Klosterman approached Classic Delight with the proposed change in distribution method rather than Classic Delight mandating such a change. Therefore, a reasonable juror could find that Klosterman's actions prevented Davidson from performing under the Distributor's Agreement, and therefore reject Klosterman's reliance on Section 9.2 of the Agreement to avoid liability on *Page 11 
Davidson's breach of contract claim.
 {¶ 25} Section 6.1 of the Distributor's Agreement imposed a duty on Klosterman to use its best efforts to assist Davidson with his sales efforts. Section 6.1 provides:
 {¶ 26} "OBLIGATIONS OF KLOSTERMAN: KLOSTERMAN shall use its best efforts to manufacture and deliver to DISTRIBUTOR sufficient quantities of the Products to supply Outlets requesting service in the Sales Area, to assist in the development of new accounts and authorizations, to pursue the development of new products, to preserve and develop the quality and marketability of the Products and to assist and cooperate with DISTRIBUTOR in his sales efforts." (Emphasis supplied.)
 {¶ 27} A reasonable juror could find that Klosterman breached Section 6.1 of the Distributor's Agreement by encouraging Classic Delight to pick up products at Klosterman's bakery rather than continue to receive the products from Davidson. Klosterman's conduct may serve its commercial interests, but that benefit does not relieve Klosterman of its contractual duties to Davidson. Therefore, the jury's verdict awarding $177,749.00 to Davidson on his Classic Delight claim is supported by some competent, credible evidence. *Page 12 
 The Termination Claim {¶ 28} The jury found that Klosterman breached the Distributor's Agreement by the manner in which Klosterman terminated Davidson's distributorship. (Dkt. 31, 39). The jury found that the breach proximately caused damages to Davidson, and it awarded $114,144.00 in damages to Davidson. (Dkt. 31, 40-41).
 {¶ 29} Klosterman argues that the jury's verdict is against the manifest weight of the evidence because Klosterman presented at trial 21 pages of complaints and complaint notices relating to Davidson's service. According to Klosterman, this evidence established that there were numerous repeated violations of Davidson's obligations under the Distributor's Agreement and that Davidson had failed to cure the problems that led to the complaints.
 {¶ 30} Article 11 of the Distributor's Agreement addresses the appropriate circumstances for termination:
 {¶ 31} "_11.1 PERFORMANCE: Except as set forth in this Article, KLOSTERMAN shall not terminate or cancel this Agreement, provided DISTRIBUTOR faithfully carries out the terms hereof. In the event DISTRIBUTOR fails to perform his obligations under this Agreement, KLOSTERMAN may terminate the Agreement as set forth below. *Page 13 
 {¶ 32} "_11.2 NON-CURABLE BREACH: In the event that the failure of performance by DISTRIBUTOR involves criminal activity, threatens public health or safety, or threatens to do substantial harm to KLOSTERMAN'S business or commercial reputation, KLOSTERMAN may terminate upon twenty four (24) hours written notice and DISTRIBUTOR shall have no right to cure.
 {¶ 33} "_11.3 CURABLE BREACH: In any other event of failure of performance by DISTRIBUTOR, KLOSTERMAN must give DISTRIBUTOR five (5) business days written notice within which DISTRIBUTOR may cure his failure of performance. If DISTRIBUTOR fails to take reasonable steps to cure such failure of performance within said five (5) day period, KLOSTERMAN may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree that numerous repeated violations constitute a chronic failure of performance and threaten substantial harm to KLOSTERMAN'S business, and in such event KLOSTERMAN shall be entitled to terminate this Agreement and DISTRIBUTOR shall have no further right to cure."
 {¶ 34} On July 22, 2004, Klosterman provided Davidson a letter from Larry Mescher, stating that Klosterman terminated *Page 14 
the Distributor's Agreement, effectively immediately. Davidson was no longer permitted to distribute any Klosterman products. It is undisputed that Klosterman did not give the 24 hours notice or five days notice contemplated by Sections 11.2 and 11.3, respectively. Although Klosterman presented a number of letters to the jury regarding multiple complaints about Davidson's service, the overwhelming majority of these complaints occurred long before the date of Davidson's termination. In fact, Phil Collins and Dennis Wiltshire both testified that Klosterman had received only one letter complaining about Davidson's service between February of 2000 and September of 2003. Tr. 174, 268-69. The letter was from Sidney Food Town. Phil Collins conceded that a part of Sidney Food Town's complaints may have resulted from the fact that deliveries were delayed because of late delivery from Klosterman's plant rather than problems in Davidson's service. Tr. 175-76.
 {¶ 35} A reasonable jury could find that the lack of notice provided by Klosterman breached the Distributor's Agreement. Further, a reasonable jury could find that the small number of complaints during the four years immediately preceding the date of termination is evidence that Klosterman terminated the Distributor's Agreement for reasons other than the permissible *Page 15 
reasons for termination set forth in Article 11 of the Distributor's Agreement. Therefore, there is some competent, credible evidence that supports the jury's verdict in favor of Davidson.
 The Sale-of-Rights Claim {¶ 36} The jury found that Klosterman breached the Distributor's Agreement by failing to sell the distribution rights to Davidson's former territory after Davidson's distributorship was terminated. (Dkt. 32, 42). The jury also found that Klosterman's breach proximately caused damages to Davidson, and it awarded $32,800.00 in damages. (Dkt. 32, 43-44).
 {¶ 37} Klosterman argues that the jury's verdict is against the manifest weight of the evidence because there was no evidence that Klosterman's efforts to sell Davidson's former distributor's rights were any less than its efforts to sell other former distributor's rights, or that Klosterman failed to act within the limits of its ability to do so in attempting to sell Davidson's former rights.
 {¶ 38} Section 11.4 of the Distributor's Agreement provides:
 {¶ 39} "ACTIONS FOLLOWING TERMINATION: Termination under _11.2 or _11.3 above shall require KLOSTERMAN, within the *Page 16 
limits of its ability to do so, to operate the business for the account of the DISTRIBUTOR, deducting its reasonable expenses in connection with the operator thereof, and to sell DISTRIBUTOR'S Distribution Rights to a qualified purchaser at the best price which can reasonably be obtained after proper notice and advertisement. Said sale shall be for the account of the DISTRIBUTOR, and the proceeds of such sale, after deducting therefrom any monies owed by DISTRIBUTOR to KLOSTERMAN, the amount of any outstanding liens, and the reasonable costs incurred in effecting the sale, shall be turned over to DISTRIBUTOR in exchange for his executed Bill of Sale, surrender of his Distribution Rights and interests under this Agreement, and a general release of claims." (Emphasis supplied.)
 {¶ 40} It is undisputed that Klosterman failed to sell Davidson's distribution rights. Klosterman argues that this failure is excused because it did everything within the limits of its ability to sell Davidson's route. The jury found otherwise, and based on the evidence at trial we cannot find that the jury's verdict is against the manifest weight of the evidence.
 {¶ 41} Phil Collins testified that Klosterman sold about a dozen routes in the Dayton, Toledo, and Columbus areas between *Page 17 
July 22, 2004 and early 2006. Tr. 145. Klosterman did not advertise Davidson's specific route. Id. Rather, Klosterman ran generic advertisements stating that routes were available for purchase. Id.
 {¶ 42} Further, Klosterman had no individual contact with any potential purchasers of Davidson's route until after it was served with a copy of Davidson's complaint, which was filed in September of 2005. Tr. 117. Indeed, Collins testified that Klosterman did not offer Davidson's route for sale until April or May of 2006. Tr. 128. Davidson testified that he suggested a prospective purchaser of his route to Klosterman after he was terminated, but Klosterman refused to accept that individual as a purchaser. Tr. 205-06. In total, Klosterman offered Davidson's route to three individuals. Tr. 128, 141. Based on the evidence presented at trial, a reasonable jury could find that Klosterman did not do everything within its ability to sell Davidson's route. The testimony of Davidson and Collins is competent, credible evidence to support the jury's verdict regarding the Sale-of-Rights Claim. Therefore, the jury's verdict is not against the manifest weight of the evidence.
 {¶ 43} The assignment of error is overruled. The judgment of the trial court will be affirmed. *Page 18 
WOLFF, P.J. and DONOVAN, J., concur.
Copies mailed to:
Lester L. Ferguson, Esq.
Harry J. Finke IV, Esq.
 Hon. Dennis J. Langer *Page 1